# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Michael T. Mason | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 5149 | **DATE** | 1/31/2003 |
| **CASE TITLE** | | Doe vs. Haliw | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | **Document Number** |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | FEB 0 3 2003 | |
| | Notified counsel by telephone. | | date docketed | 63 |
| ✓ | Docketing to mail notices. | | AR | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| MF | courtroom deputy's initials | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

| | |
|---|---|
| DONALD DOE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 99 C 5149 |
| v. | ) |
| | ) Mag. Judge Michael T. Mason |
| TARAS HALIW, PATRICK DEMPSEY, | ) |
| JOHN LAWSON, MICHAEL MAROTTA, | ) |
| RICHARD EDDINGTON, the VILLAGE | ) |
| OF ROSELLE, A Municipal Corporation | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Before us are cross motions for summary judgment to plaintiff Donald Doe's[1] allegations that various individual members of the Roselle police department violated his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, as well as his rights secured by 42 U.S.C. § 1983, when they interviewed plaintiff's psychiatrist without his permission. Doe also alleges that the Village of Roselle violated his rights under 42 U.S.C. § 1983 by maintaining a policy of having its officers conduct unlawful searches. After reviewing all of the parties' briefs, Rule 56.1 statements, and exhibits, we grant summary judgment for the defendants in its entirety.

**Facts**

In support of their motions, each party submitted its own Rule 56.1 statement of

---

[1] The parties have agreed to keep plaintiff's real name confidential throughout these proceedings. Thus, we will refer to plaintiff as either "Doe" or "plaintiff".



undisputed facts, as well as a response to its opponent's statement. However, plaintiff's response to defendants' Rule 56.1 statement does not conform to the Federal Rules of Civil Procedure. Instead of either admitting or denying each individual statement and then citing to evidence supporting his version of the facts, as required by Fed.R.Civ.P. 56.1(b)(3)(A), plaintiff merely makes a blanket objection that many of the statements are non-material and of no assistance to the Court because the information they set forth was obtained pursuant to subpoena or during discovery and was thus not available to the Roselle police during the initial investigation and interview of Doe's psychiatrist. In addition, Doe complains that several of defendants' facts regarding his doctor's testimony are unreliable because his doctor's deposition did not give enough detail. It is true that a portion of the defendants' Rule 56.1 statement sets forth testimony from the plaintiff and others that defendants did not receive until after the interview of Doe's psychiatrist.[2] Because this information is not material to our determination regarding the lawfulness of the interview of the doctor, we will not consider it. Plaintiff's other objections are not adequate to counter defendants' statement of undisputed fact, as they do not even mention the majority of defendants' contentions. Thus, except for the non-material facts described in footnote two, we will deem defendants' statement of facts as admitted. *See Jupiter Aluminum Corp. v. Home Ins. Co.*, 225 F.3d 868, 871 (7th Cir. 2000). Plaintiff's own

---

[2] For example, the defendants set forth numerous facts concerning the revocation of Doe's FOID card and the inconsistent (and sometimes incredible) testimony Doe gave at his deposition and an administrative hearing regarding his recollection of the alleged robbery. Much of this information appears to be aimed at bolstering defendants' contention that they were justified in interviewing Doe's doctor because there was real reason to be concerned about Doe. Although the inconsistencies and other testimony do create more suspicions about Doe's mental state and his truthfulness on the day of the alleged robbery, we cannot consider them since they were not available to the police at the time they interviewed Dr. Hillenbrand. That is, we will only accept as undisputed fact that information the police obtained from various sources prior to the interview.

56.1 statement is in proper form, so we will consider it as well.[3]

The basic issue in this case centers around whether defendants unlawfully infringed on the plaintiff's constitutional rights when they spoke to his psychiatrist about whether medications the plaintiff was taking could cause delusions. The interview with the psychiatrist came about after two members of the Roselle police department, Officers Stokes and Dempsey, responded to plaintiff's call about an attempted burglary at his town home; certain aspects of the incident and the subsequent investigation into the burglary attempt raised concerns about plaintiff's mental state and his ability to safely handle the numerous firearms that he kept in his basement.

### Stokes' Report

On February 25, 1998, plaintiff called the Roselle police department to report that an individual had tried to burglarize his home. Officer Stokes was the initial officer on the scene. He was followed soon thereafter by Sergeant Dempsey, who met the plaintiff – who was holding a loaded gun – in the back yard of the town home. The following information is taken from Stokes' police report, filed on February 25, 1998, regarding the incident. Plaintiff told Stokes that while lying in bed in his first floor bedroom, he heard the sliding glass door to the room being "jimmied" open, and that he armed himself with a handgun he kept in his bedside table. He also told Stokes that the intruder held a crowbar in his left hand and at one point put his right hand under his jacket as if he was reaching for a

---

[3] Since the parties have filed cross motions for summary judgment, we would expect their versions of the relevant facts to be similar, because we can only consider the parties' legal arguments if there is no dispute of material fact. However, as we explain below, that is not always the case. Determining the undisputed facts in this case is complicated because most of the witnesses provided testimony on at least two different occasions, once during an administrative hearing regarding the revocation of Doe's FOID card and again during depositions taken as discovery in this case.

3

weapon;[4] when Doe announced that he had a gun, the intruder fled over a privacy partition that separated Doe's town home from the one next door, and then escaped by climbing onto the roof. Doe followed the intruder outside with his gun, but lost sight of him when he climbed onto the roof. While Stokes was at the town home, Doe showed him his extensive collection of guns and other weapons which he kept in his basement, mentioning that many of them could pierce police body armor.

In his report, Stokes noted that parts of Doe's story were not consistent with his contention that an intruder had attempted to break into the house. Specifically, Doe reported that at the time of the incident, the screen door in front of his sliding glass door was open; when Stokes arrived on the scene both doors were locked.[5] Further, although the sliding door had fresh scratches on it, neither door showed signs consistent with a forced entry. Doe had told Stokes that the intruder was attempting to lift the sliding glass door off its tracks to get it open and that he saw the door moving up and down in its track; Stokes did not believe that such treatment would have resulted in the scratches he observed. Further, the privacy partition did not show any scuff marks or signs that a person had scaled the wall, and two gas company workers who were restoring service to Doe's house told Stokes that they had not seen anyone running away from the town home,

---

[4] The parties dispute whether plaintiff told Stokes he had seen a weapon or merely believed the intruder had one; Stokes' report of the incident specifically states only that Doe thought the intruder was reaching for a gun. When questioned by Detective Haliw several days later, Doe told him that he actually saw a gun in the intruder's belt. Because plaintiff does not correctly object to defendants' statement of undisputed facts, we credit defendants' account and note that the police considered Doe to have given conflicting versions of the event. In any event, it is not material to our determination which version of this fact is accurate; at the very least, the parties agree that plaintiff's actions were based on the belief that the intruder may have had a gun.

[5] Doe told Stokes he had locked both doors after the intruder fled.

on the roof or otherwise.  Although Doe had called to the workers that there was a man with a gun in the area, the only armed individual they saw was Doe himself.[6]

Sgt. Dempsey assigned Detective Haliw to investigate the attempted robbery; Haliw interviewed Doe himself and filed a report on March 3, 1998.  During the course of the investigation, which included interviews with various individuals identified by Doe and others, Haliw also became suspicious of Doe's story and concerned about the fact that Doe possessed a Firearm Owner's Identification Card ("FOID" card), especially given the large amount of weaponry Doe kept in his home.  Although Stokes testified at an administrative hearing regarding the incident that he never felt threatened by Doe during the initial investigation, and that he and Doe had "a fine conversation", Detective Haliw testified at his deposition that Stokes had told Haliw shortly after the incident that Stokes thought Doe "was nuts."[7]  Further, Dempsey told Haliw that on the day of the incident, Dempsey thought Doe was acting strangely.

*Haliw's Interview with Doe*

Doe told Haliw essentially the same story he had relayed to Stokes, except he specifically stated that he had seen the intruder with a gun and that he believed the intruder was planning to kill him.  He told Haliw that he had previously been employed by the U.S. Department of Defense as a civilian consultant and firearms expert with security clearance, but that he was currently on disability as a result of an injury he received while

---

[6] The gas company workers asked Officer Stokes to stay at the town home until they finished their work.

[7] This is not hearsay because it is not offered to prove that Doe was in fact mentally unstable, but instead to show Haliw's state of mind regarding Doe and the investigation.

working on the so-called "Nicaragua incident." Doe also told Haliw that there would be no record of this work on any government payroll. Doe identified for Haliw three individuals who might wish to kill him because of arguments they had had in the past. He told Haliw that he had tried to take a gun to the hospital to visit his dying father several months earlier because he knew that one of the individuals, Patrick Greely,[8] would be there. The second individual Doe believed might want to kill him was a neighbor with whom he had an argument. The third was a former friend named Robert Polich, with whom he had argued concerning Doe's inclusion as a beneficiary in a mutual friend's will.

### Interviews with Robert Polich and Doe's Wife

Haliw and Detective Marotta met with Polich prior to March 3, 1998 and identified themselves as Roselle police detectives. Without being told the subject matter of the meeting, Polich immediately told the detectives he knew that they were there to talk to him about Doe. Polich believed that Doe was dependent on several prescription drugs he took for a degenerative muscle disease and that he had become delusional.[9] Before the detectives told Polich any details of their investigation, Polich told them that Doe had previously fired his gun at animals in his yard and pulled his gun on landscapers working there. He also said that Doe had attempted suicide once in the past,[10] that he believed

---

[8] Plaintiff told Haliw that Greely was a suspected cocaine dealer and pedophile who had had an affair with plaintiff's sister, and, plaintiff suspected, his wife.

[9] At his deposition, Doe related that at least one doctor had told him that the doctor believed Doe was abusing narcotics and had made up illnesses in order to obtain drugs.

[10] Specifically, on October 17, 1990, Doe took an overdose of medication. His suicide note stated that he could not imagine going on without his "meds."

6

people were out to kill him, and that he heard people walking around on his roof at night.[11]

Polich confirmed that Doe was a capable marksman and very competent with firearms; he told the officers they should be careful if they ever had need to enter Doe's residence, as Polich feared Doe could become involved in a stand-off with police. He said that to his knowledge, Doe had never been involved with the Department of Defense or any incident in Nicaragua. Polich explained that it was he who had been in the military and assigned to Honduras as a technical hardware specialist; he suspected Doe had taken parts of Polich's past as his own. Upon being told by the detectives that Doe had spoken of visiting his father on his deathbed, Polich told the detectives that as far as he knew, Doe's father was still alive.

The detectives visited Doe's wife at her place of employment on March 4, 1998. She told them that her husband suffered from fibromyaligia, a degenerative muscle disease, and that he was taking several medications for this and other pain related to problems with his back and hip, but that she did not know the medications by name. She told the detectives that to her knowledge, Doe had never been involved in the military or government, and that although Doe's father had been hospitalized several months earlier, he was still alive. She told the detectives that Doe was currently a patient of a Dr. Hillenbrand, a psychiatrist, and that they should talk to him if they had additional questions about Doe's medications.

---

[11] Defendants cite to Haliw's police report of his interview with Polich to support these facts. It is not hearsay because it is not being presented to prove the truth of Polich's assertions, only to show that the officers gained information during their investigation that gave them concerns about Doe's mental state.

*Interview with Dr. Hillenbrand*

Immediately after meeting with Doe's wife, Haliw and Lawson went to see Dr. Hillenbrand. The record is not clear about whether Haliw informed Sgt. Dempsey ahead of time that he was going to see Dr. Hillenbrand. Haliw says that he did not speak with Dempsey beforehand; Dempsey initially testified that he and Haliw did speak, but stated in a later deposition that he could not remember for certain. Dempsey did say that he saw no harm in Haliw speaking to Doe's psychiatrist, especially since Doe's wife had given them the doctor's name, but that he was surprised the doctor agreed to talk to them, since some doctors refused to do so when approached by detectives conducting investigations.

When he went to interview Hillenbrand, Haliw was aware that a physician/patient privilege may prevent the doctor from speaking to them about Doe. Over the course of his eighteen years as a police officer, Haliw had visited many other doctors as part of various investigations, sometimes with the patient's consent, sometimes without. All of the individual defendants had some familiarity with the physician-patient privilege.

Det. Haliw did not obtain Doe's permission to speak with Dr. Hillenbrand, nor did he get a search warrant prior to visiting the doctor. At the interview, Haliw told Hillenbrand that he did not have to speak to the police if he did not wish to do so. Haliw also told Hillenbrand that he was investigating a potentially dangerous situation involving Doe, in which Doe had been running around the neighborhood chasing an imaginary intruder and had experienced a delusional episode creating safety concerns. Dr. Hillenbrand agreed to speak to the police about Doe; he did not feel threatened or pressured to do so other than because of the potentially dangerous situation involving Doe. Dr. Hillenbrand also testified that he believed the officers were describing an incident that had just occurred, not

8

one that had happened five or six days in the past; had he understood that Doe's possible hallucination had occurred nearly a week earlier, he would have probably required the officers to obtain Doe's consent.[12]

Det. Lawson, who accompanied Haliw to interview the psychiatrist, believed that one did not need to obtain a patient's permission to speak with his or her doctor if there was a public safety issue; he was satisfied with Haliw's explanation of the privilege to Dr. Hillenbrand as well as the fact that Haliw told Hillenbrand he did not have to speak to the officers. Haliw did not have any knowledge concerning Illinois' Mental Health and Developmental Disabilities Confidentiality Act ("the Confidentiality Act") 740 ILCS 110/1 *et. seq.* Sgt. Dempsey had some familiarity with the Confidentiality Act and understood that pursuant to it, a doctor may refuse to disclose information about a patient.[13]

During the interview, Hillenbrand did not show the police any of Doe's medical records. The conversation centered mainly around an explanation of Doe's fibromyaligia and the medications he was taking for pain. Dr. Hillenbrand explained that he was trying to wean Doe off of some of the pain medication he was taking, and had prescribed the maximum therapeutic dosage of a medication called Clonidine – which was administered

---

[12] There is some dispute about whether Haliw described the situation as an "emergency" or whether Dr. Hillenbrand perceived the situation as an emergency; plaintiff's own brief states at one point that Haliw did not use the term "emergency" but then later says that he did. However, there is no dispute that Haliw communicated to Hillenbrand some concern that Doe could pose a safety threat to himself or others, and on the basis of that concern, Hillenbrand agreed to speak to the police officers.

[13] The parties agree that Dr. Hillenbrand, although a psychiatrist, never provided any mental health services to Doe. Instead, he treated Doe solely for pain and prescribed medications for such. Dr. Hillenbrand was unaware that Doe had attempted suicide in the past.

via a patch – to combat withdrawal symptoms.[14] One of the side effects of taking a high dosage of Clonidine could be hallucinations or delusions.[15] Dr. Hillenbrand agreed with the police that if Doe was acting in the way described by the police, he could be experiencing hallucinations and could be a danger to himself or others.[16] If this were the case, Clonidine should be looked at as a possible cause.[17]

Sgt. Dempsey kept in contact with Haliw during the course of the investigation. He also kept Roselle Police Chief Eddington, another individual defendant, apprized of the situation as it developed, but there is no evidence that Eddington was specifically aware that Haliw planned to speak with Hillenbrand prior to the interview. The parties agree that at some point, the defendants decided that there was a public safety concern regarding Doe's retention of a valid FOID card and his guns.[18] Thus, a process was instituted to revoke the FOID card and remove Doe's collection of weapons from his possession.

---

[14] On the day of the interview, Doe called Dr. Hillenbrand's office twice before the officers arrived to ask the doctor to increase his pain medication.

[15] Dr. Hillenbrand did not indicate that the maximum therapeutic dose of Clonidine Doe was taking was the same thing as a "high dose" which might cause delusions. However, he later testified at his deposition that a drug reference book he showed the detectives during their visit indicated that even a therapeutic dosage could cause delusions on certain, albeit rare, occasions.

[16] Although it is not apparent that the police were aware of this prior to their interview of Dr. Hillenbrand, on three occasions in the two years proceeding the incident, either Doe or his wife had reported to the doctor that Doe was suffering from various delusions.

[17] In a later affidavit, Dr. Hillenbrand disputed some of the characterizations of his interview with Haliw that were contained in Haliw's report as well as in a letter to the FOID division of the Illinois State Police. However, we find that most of Hillenbrand's objections are fairly minor disputes that certain information was condensed or summarized, rendering it slightly less exact.

[18] Sgt. Dempsey initially testified that his concern for the public safety crystalized after Haliw's interview of Dr. Hillenbrand. However, he also stated that defendants concerns were a result of information they accumulated gradually from the entire investigation. On cross examination, he recalled that Haliw's interview with Polich was a substantial factor in raising public safety concerns.

LEGAL ANALYSIS

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). We must evaluate the admissible evidence supporting the motion in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). "Rule 56(c) mandates summary judgment when the nonmoving party fails to establish the existence of an element essential to its case and on which that party will bear the burden of proof at trial." *Jefferson v. City of Chicago*, No. 97 C 4895, 2000 WL 1368036 (N.D.Ill., Sept. 15, 2000) (citing *Anderson*, 477 U.S. at 252). On cross motions for summary judgment, each movant must individually satisfy the requirements of Rule 56. *See Equal Employment Opportunity Commission v. Admiral Maintenance Service, L.P.*, No. 97 C 2034, 1998 WL 102748 (N.D.Ill. Feb. 26, 1998).

Plaintiff contends that each of the individual defendants is guilty of violating his constitutional rights by conducting an illegal search and seizure of his medical information. He also argues that the Village of Roselle, through Chief Eddington, maintained an official policy of having its officers violate individuals' constitutional right to be free from unlawful searches and seizures, and denied him due process of law relating to persons who were lawful firearms owners.

In response, the defendants make several arguments. First, they argue that Det. Haliw and Det. Lawson's interview of Dr. Hillenbrand was not a "search" for 4th Amendment purposes. The defendants also argue that it would not be reasonable for Doe

11

to expect that a conversation with his doctor should remain private since he had previously been required to disclose much of the same information to the Illinois State Police when he originally applied for his FOID card. Next, defendants argue that even if a search occurred, it was reasonable under the circumstances. Finally, defendants contend that each individual defendant is entitled to qualified immunity. As for the Village, defendants argue that the evidence fails to demonstrate that Roselle maintains any sort of official policy of violating citizens' constitutional rights. We will address each argument in turn.

### Did Defendants Conduct a Search for 4th Amendment Purposes?

The first question we must address is whether Haliw's and Lawson's interview of Dr. Hillenbrand even implicated Doe's 4th Amendment right to be free from unlawful searches and seizures. "The Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their direction." *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 613 (1989). The Supreme Court has held that a "'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *Schaill v. Tippecanoe County School Corp.*, 864 F.2d 1309, 1311-1312 (7th Cir. 1989), *citing United States v. Jacobson*, 466 U.S. 109, 113 (1967).

In their initial brief, defendants argue that the interview of Dr. Hillenbrand did not implicate the 4th Amendment because the doctor could have refused to speak to them if he wanted. Instead, the doctor chose to continue the interview pursuant to the Confidentiality Act, an Illinois statute granting him sole discretion to disclose information about Doe if he concluded that making such disclosures could prevent a "clear, imminent risk of serious physical or mental injury" by the patient on himself or others, or by others

12

against the patient. 740 ILCS 110/11. In their reply brief, defendants also argue that no court has found that a violation of the 4th Amendment occurred under circumstances similar to those here, and that plaintiff does not even address the question of whether the interview was a search, instead focusing solely on the alleged search's reasonableness.

We agree with the defendants that we have found no cases holding that a police investigation in which a doctor consents to speak to an officer about a patient constitutes a search. However, that does not end our inquiry, since the determination of whether a search occurred turns on the reasonableness of Doe's expectation that information kept by Dr. Hillenbrand about his treatment – such as the name and possible side effects of medication(s) Doe was taking to combat withdrawal – would remain confidential.

Although they do not explicitly say so in their briefs, defendants imply that because the Confidentiality Act provides an exception to any privacy expectation a patient might otherwise have, it was not reasonable for Doe to expect that Dr. Hillenbrand would refuse to speak to the police in a situation in which Doe might be a danger to himself or others. That is, there can be no search when a doctor voluntarily reveals information about a patient under the circumstances present here. Second, defendants argue that Doe had a decreased expectation of privacy anyway, since he was required to disclose much of the same information provided by Dr. Hillenbrand on his application for a FOID card.

As the plaintiff points out, the question of whether Dr. Hillenbrand's decision to speak to the police was a "search" really collapses into the question of whether the search – if one occurred – was reasonable. That is, defendants argue that no search occurred because Dr. Hillenbrand could have refused to speak to them. But if a search occurred, it was not because the police spoke to Hillenbrand at his office, but because they gave him

13

certain information about Doe that led him to decide to answer their questions. We cannot separate the question of whether there was a search from the question of whether that search was reasonable under this scenario. If Dr. Hillenbrand had refused to speak to the officers about Doe without either a warrant or Doe's permission, we would be confident in holding that the very attempt of the officers to interview the doctor did not constitute a 4th Amendment search. But since the police officers took certain actions that led Dr. Hillenbrand to speak to them, we have to evaluate the issue of reasonableness.

We find that there is a question of fact about whether the officers' visit to Dr. Hillenbrand was a "search" for 4th Amendment purposes (and whether the search, if any, was reasonable) because there is a dispute about the information the doctor had before him when he decided to talk to the police. Although the parties agree that Dr. Hillenbrand understood there to be some concern regarding Doe's risk to himself or others, they disagree about the doctor's understanding of the imminence of the threat and exactly what information the police gave him. He testified at an administrative hearing regarding the revocation of Doe's FOID card that, had he understood that Doe's alleged hallucinations had occurred five or six days prior to Haliw's and Lawson's visit, he would have required the police to obtain Doe's consent before he spoke to them about Doe. Thus, we cannot say with certainty that Hillenbrand used his sole discretion in deciding to speak to the officers without Doe's consent.[19] This dispute of fact prevents us from evaluating Haliw and Lawson's actions with regard to their interview of Hillenbrand, and so we cannot grant

---

[19] We do want to note that this dispute of fact does not imply that the officers purposely exaggerated the situation or otherwise purposely misled the doctor regarding Doe, only that there was some confusion regarding the imminence of the situation.

14

summary judgment to either them or Doe on the basis of this argument.[20] However, there is no dispute that neither Dempsey nor Eddington participated in the interview of Hillenbrand. Even if we accept plaintiff's version of the facts that Dempsey was aware that Haliw and Lawson planned to speak to the doctor, Doe presents no argument or case law to support his contention that either Dempsey or Eddington participated in a search of Doe's medical information because of their mere knowledge of the investigation. Thus, we grant summary judgment in their favor

We also reject the defendants' argument that Doe had a decreased expectation of privacy in the information provided by Dr. Hillenbrand, since he had provided some of the same information in his application for a FOID card and an earlier letter regarding the card's revocation.[21] It is undisputed that certain information provided by the doctor – such as the fact that Doe was trying to reduce the amount of pain medication he was taking, the fact that he was taking a different medication to help combat symptoms of withdrawal, and the name of that medication and its possible side effects – was not revealed elsewhere. So we cannot say that Doe's inclusion of certain information in his FOID application *per se* made it unreasonable to believe that Dr. Hillenbrand would keep the information

---

[20] Defendants cite to *Young v. Murphy*, 90 F.3d 1225 (7th Cir. 1996) for the proposition that an investigation such as that conducted by the police cannot be a search under the 4th Amendment. But *Young* dealt with a review of a patient's hospital and nursing home records by investigators trying to determine if a resident was being taken advantage of by an attorney. The Court held that the patient did not allege any possessory interest in the records that would implicate the 4th Amendment. In contrast, here Doe alleges that both the Confidentiality Act and the physician-patient privilege gave him an expectation that Dr. Hillenbrand would keep his medical information confidential.

[21] We cannot tell if Doe's FOID card was revoked at some point prior to the incident, but there is no dispute that it was valid at the time of the alleged robbery attempt.

confidential.[22]

42 U.S.C. § 1983 provides a federal cause of action for "the deprivation under color of law of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States." *Gossmeyer v. McDonald*, 128 F.3d 481, 489 (7th Cir. 1997) (*citing Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994)). To prevail on his § 1983 claim against Haliw, Eddington, Dempsey and Lawson in their individual capacities, Doe must show that they were directly responsible for the actions that allegedly deprived him of his Constitutional rights, in this case, his right to be free from unlawful searches and seizures in violation of the 4th Amendment. *See Moore v. State of Indiana*, 999 F.2d 1125, 1129 (7th Cir. 1993). An individual is directly responsible for a Constitutional violation "if the conduct . . . occurs at [his] direction or with [his] knowledge or consent." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) *citing Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1989). "In other words, the defendant must 'know about the conduct, facilitate it, condone it, or turn a blind eye. . .'" *Gentry*, 65 F.3d at 561 (*citing Jones v. City of Chicago*, 856 F.2d, 985, 992 (7th Cir. 1988)). Since we find a question of fact about whether Doe was subjected to an unlawful search and seizure in violation of the 4th Amendment, we cannot evaluate whether any of the defendants may have violated §1983 by engaging in conduct that violated Doe's rights.

---

[22] Doe cites many cases in support of his contention that the actions of the officers constituted an unlawful search. Most of these cases are distinguishable in that they presume that the actions in question are searches and the only question is whether the searches are reasonable. Further, most of these cases implicate invasions of privacy far more serious than the one here, such as the compelled testing of an individual's blood or urine based on something less than probable cause. *See, e.g., Ferguson v. City of Charleston*, 532 U.S. 67, 76 (2001).

### Other Alleged Violations

In his response brief, the plaintiff cites to a laundry list of cases that involve various scenarios regarding patient confidentiality under both federal and state law. None of the cases involve facts similar to those presented here; plaintiff seems to want this Court to conclude that because other courts have recognized some right to privacy in certain types of medical information in some situations, we should find a violation on the facts presented here.

For example, plaintiff states that patients undergoing medical treatment have a right to privacy in the results of their medical tests and that in addition to the protections of the Confidentiality Act, Illinois law provides for a statutory doctor/patient privilege, 735 ILCS 5/8-802. However, the District Court rejected all of plaintiff's claims of violation of state law and none of the cases cited by the plaintiff add anything to what is really his basic argument: that because the police officers questioned Dr. Hillenbrand without either a search warrant or Doe's consent, they violated the 4th Amendment to the Constitution.[23] Thus, our focus remains on that incident.

### Qualified Immunity

Next, the defendants argue that the individual officers are entitled to qualified immunity and thus cannot be held liable for a violation of Doe's 4th Amendment rights, even if we found a violation had occurred. We agree. "The defense of qualified immunity

---

[23] To the extent that the plaintiff is arguing that the interview also violated his right to privacy under the 14th Amendment, the District Court rejected this claim in its opinion denying defendants' motion to dismiss, informing defendants that their argument concerning plaintiff's right to privacy was misplaced since what plaintiff was really claiming was a violation of the 4th Amendment. Although the plaintiff claims in his briefs that his 14th Amendment rights were violated as well, his basis for the violation is again the defendants' alleged unlawful search.

shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.'" *Marshall v. Allen*, 984 F.2d 787, 791 (7th Cir. 1993) *citing Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Seventh Circuit has established a two-part test to determine whether the actions of a government official (such as a police officer) are entitled to qualified immunity: "1) does the alleged conduct set out a constitutional violation? and 2) were the constitutional standards clearly established at the time in question?" *Zorzi v. County of Putnam*, 30 F.3d 885, 892 (7th Cir. 1994), *citing Rakovich v. Wade*, 850 F.2d 1180, 1210 (7th Cir. 1988).

As we explained above when we granted summary judgment for Eddington and Dempsey, we find that they cannot even be found to have participated in a possible Constitutional violation. The undisputed evidence shows that, at most, Dempsey was aware that Haliw and Lawson were planning to visit Dr. Hillenbrand to talk to him about Doe, and that Eddington was not even aware of this fact before the interview occurred. We have seen no case law that would lead us to conclude that the mere attempt to interview a doctor by the police implicates any sort of Constitutional protection, so there is no way Eddington or Dempsey could have participated in a Constitutional violation.

There is at least a question of fact about whether Haliw and Lawson violated Doe's 4th Amendment rights when they interviewed Doe's doctor. But Doe fails to demonstrate that the right the officers are alleged to have violated was clearly established at the time of the event. "A clearly established right is one that is established in a particularized sense rather than a general one like the Fourth Amendment's right to be secure against unreasonable searches." *Hinnen v. Kelly*, 992 F.2d 140, 142 (7th Cir. 1993). The question

is objective and fact-specific; "an officer's action must be considered in light of the particular circumstances he or she faced." *Id., citing Anderson v. Creighton*, 483 U.S. 635, 641 (1987). That is, a police officer is entitled to qualified immunity if his or her actions "could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson*, 483 U.S. at 638.

In this case, we find that Haliw and Lawson's actions were reasonable in light of the requirements of the 4th Amendment. Plaintiff argues that the Seventh Circuit has recognized that individuals have a "qualified constitutional right to the confidentiality of medical records and medical communications." *Anderson v. Romero*, 72 F.3d 518, 522 (7th Cir. 1995), *citing Pesce v. J. Sterling Morton High School Dist. 201*, 830 F.2d 789, 795 (7th Cir. 1987). This may be true, but the general rule Doe cites does not speak to the facts here, in which the officers visited Dr. Hillenbrand, told him they were concerned about Doe's mental stability in light of recent events, and informed him that he was free to refuse to speak with them if he chose. These actions are consistent with a respect for Doe's rights under the 4th Amendment as well as the Confidentiality Act and do not demonstrate the sort of overreaching behavior that established 4th Amendment case law clearly prohibits.

Although we ruled above that there is a question of fact regarding exactly what the officers told Dr. Hillenbrand about Doe before he agreed to talk to them, even the plaintiff's version of the facts does not show that Haliw and Lawson violated a clearly established constitutional norm by speaking to Dr. Hillenbrand. At most, Haliw and Lawson may have somewhat exaggerated the situation based on their own concerns about Doe's mental state; there is no allegation that the officers lied or intentionally misled the doctor, and

19

plaintiff does not argue that the defendants did not have any basis for concern. Given this scenario, plaintiff does not point to any cases that establish a clear violation of Doe's 4th Amendment rights because of the defendants' actions. Thus, we find they are entitled to qualified immunity, and grant summary judgment for all of the individual defendants.

### Liability of the Village of Roselle

Next, Doe argues that Roselle, through Chief Eddington, violated his § 1983 rights to be free from unreasonable searches and seizures in violation of the 4th Amendment. In order to find a municipality liable under § 1983, a plaintiff must show that the alleged unconstitutional actions of the municipality's employees were taken pursuant to an official policy or custom. *See Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691 (1978). In order to show that a municipality's policy has violated his rights, Doe must show one of the following: 1) an express policy that, when enforced, causes a constitutional violation; 2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a 'custom or usage' with the force of law; or 3) an allegation that the constitutional injury was caused by a person with final policymaking authority. *See McTique v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995).

Doe argues generally that the municipality had a policy of failing to properly supervise its employees, presumably with regard to respecting individuals' constitutional rights. Doe does not explicitly state which of the three above standards upon which he relies to support his allegations, and fails to identify any sort of express policy that might cause a constitutional violation. Further, he does not show, or even allege that anyone with "final policymaking authority" caused an alleged Constitutional violation. Thus, the

20

question is whether Doe has submitted sufficient evidence to demonstrate that Roselle had a long-standing unwritten policy of failure to supervise its officers who were conducting police investigations. A policy of inadequate supervision may amount to municipal liability if it amounts to deliberate indifference to the rights of the individuals affected by the police actions. *See Canton v. Harris*, 489 U.S. 378, 388-89 (1989).

Doe fails to point to any facts demonstrating the existence of an unwritten custom or policy of failure to supervise. Instead, he merely points to brief portions of the deposition testimony of Haliw, Dempsey and Eddington in which they discussed Haliw's interview of Dr. Hillenbrand and argues that the officers' seeming (in his view) lack of concern about whether the interview might infringe upon Doe's rights shows deliberate indifference. With respect to Haliw, Doe merely points to Haliw's testimony that he had visited many doctors during the course of investigations throughout his career, implying that each of these visits was a 4th Amendment violation and thus proof of an unconstitutional policy.[24] Even if Doe could prove that the actions of Haliw and Lawson did violate his 4th Amendment rights, this is not enough to demonstrate the existence of an unwritten policy of failure to supervise, especially since the record is devoid of evidence of any other complaint of this sort against the defendant municipality. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985)("Proof of a single incident of unconstitutional activity is not sufficient to implicate liability under *Monell* unless proof of the incident also includes proof that it was caused by an existing, unconstitutional municipal policy."). In this case, Doe cannot bootstrap his argument that there existed such a policy by pointing only to the actual event that gave rise

---

[24] As we explained above, we find there is not even a possible constitutional violation from the mere act of a police officer visiting a person's doctor and attempting to interview him or her.

to his own cause of action. Therefore, we grant summary judgment in favor of the Village of Roselle.

For the above reasons, we find there is a question of fact about whether the actions of Haliw and Lawson constituted a violation of Doe's 4th Amendment rights, but grant summary judgment to Dempsey and Eddington on Doe's 4th Amendment claims and to all of the individual defendants on the ground of qualified immunity. We also grant summary judgment to the Village of Roselle on Doe's § 1983 claim. It is so ordered.

ENTER:

MICHAEL T. MASON
United States Magistrate Judge

Dated:    January 31, 2003